# DECISIONS

OF THE

# TERM HELD AT JACKSONVILLE, 1853.

LUKE, A SLAVE, PLAINTIFF IN ERROR, VS. THE STATE OF
FLORIDA.

1. The law of Florida discriminates between free white citizens and persons of color, whether bond or free, in the mode and degree of punishment for the same offences; the first named being amenable to the act of February 10th, 1832, while the latter are provided for in the act of November 21, 1828.

2. The maxim of "*leges posteriores priores contrarias abrogant*" is not applicable to cases where the precedent act is special or particular, and the subsequent act is general, the rule being, that a later general act does not work any repeal of a former particular statute. Hence it follows, that the act of November 21, 1828, in relation to crimes and misdemeanors committed by slaves, free negroes, and mulattoes, is not repealed by the act of February 10, 1832, in relation to crimes and misdemeanors generally.

3. Slaves and free persons of color may be guilty of many of the offences which may be committed by white persons; in such case, if it is an offence at common law, the indictment must be under the act of 1828, because this statute regulates the punishment, and if it is an offence created by the statute of 1832, or any other act a slave or free person of color can commit, the indictment should be under both statutes, that which creates the offence, and the act of 1828, which prescribes the punishment.

Error to the Circuit Court of St. John's County.

This was an indictment found by the Grand Jury of St. John's County against Luke, a slave, for maliciously wounding animals.

The following statement of facts was agreed upon by the solicitor for the State and the Counsel for the prisoner, viz:

24

"That a negro driver of Joseph M. Hernandez, in search-
"ing for certain stray mules, the property of his said mas-
"ter, found one of his said mules dead upon the road lead-
"ing from his master's plantation to the plantation of
"Abraham Dupont, and two others badly injured with
"gun shot wounds, of which injuries they subsequently
"died. The mule was shot. That witness traced the
"mules to the plantation of said Dupont, prisoner's mas-
"ter, by the blood upon the ground, and meeting with
"prisoner, asked him if he knew who had shot said mules?
"Prisoner replied that he had shot them, and was ordered
"so to do by his master—that the mules had come to his,
"prisoner's garden, in an unclosed field, and destroyed it,
"that he had complained to his master thereof, and asked
"him what he should do if they came again, and that his
"master told him to shoot them; and he had done so.
"Witness further stated that prisoner had told him that
"the mules were in the habit of troubling his master's
"plantation; and it was also in evidence that his master
"was not present when he shot the mules, and that priso-
"ner was the head driver of the plantation." Whereupon
prisoner's counsel asked the Court to charge the jury that
the prisoner had committed no act for which he should be
criminally punished—for that the shooting the said mules
as charged in the indictment was not done maliciously, or
could be by him, he, prisoner, being a slave, and acting
under the control and direction of his master—which in-
struction the Hon. Thomas Douglas, Judge of said Court,
declined to give, but having held the same under advise-
ment, reserved the question. Thereupon the jury having
rendered a verdict, the Court suspended the sentence until
the following term of said Court, and on the 23d day of
August, 1852, refused the instructions asked by the pris-
oner's counsel. Whereupon prisoner's counsel moved an

arrest of judgment and for a new trial, and assigned the grounds aforesaid, which motion was overruled by the Court, and sentence pronounced—to which rulings prisoner's counsel objects, and excepts and alleges the same as error.

*McQueen McIntosh* for Appellant.

1. Prisoner was not liable to indictment under the act of 10th February, 1832, for malicious mischief, for the reason that it was evidently intended, in its penal consequences, to apply exclusively to free persons, and not slaves, the exception being in the 8th section of the act. That section distinctly shows that it was never the intention of the Legislature to lay a fine upon slaves. The punishment in all the other sections is in the alternative, and if a prosecution against a slave can be maintained, the Jury might, in their discretion, impose a fine upon slaves, which would be an absurdity.

It is a penal statute, and must be construed strictly; and if the Legislature had intended to extend the operation of the 8th section over the whole act, it would have so stated. The very exception in prescribing the manner of punishment in the 8th section, repels the presumption that the act at large had any relation to the commission of the various offences enumerated in it, by slaves. Thomp. Dig., p. 505-6-7.

The position is further sustained by the fact that in every other criminal offence committed by a slave, the punishment is death or whipping; and, except in the case of murder, the penal code creates the distinction in the manner of punishment between the free man and the slave. Thomp. Dig., p. 537, 84, 40, &c.

The Legislature has passed two general acts for the punishment of crimes and misdemeanors—the one relating to

white persons, and the other relating to offences committed by slaves and free persons of color. Pamp. Laws of 1828, p. 48, 174. And this indicates the fact that slaves were not supposed to fall within the provisions of the act of 1832, which is a modification of the act of 1828, relating to crimes and misdemeanors, unless specially designated, as in section 8.

The Legislature has expressely provided the manner in which slaves shall be punished. Thomp. Dig., p. 541, Sec. 19, 20.

If this be so, the verdict of the Jury, for a term of imprisonment, cannot be enforced.

It might be contended that the act under which the prisoner was indicted is general in its terms, when it says "if any person shall maliciously," &c. Yet it would be in contravention of the spirit of the law to apply to slaves such portion of it as relates to bigamy, adultery, &c., wherein the same phraseology is used. Thomp. Dig., p. 499.

The prisoner, acting at the instigation and under the control of his master, was incapable of committing the offence charged in the indictment. There was the absence of will, without which there was no malice, the essence of the crime, and what must be proven. 4 Black. Com., Chap. 2, marg. p. 21, 27, 28 ; 1 Russ. on Crimes, p. 1, 17.

The slave is a chattel in law, and has no volition to disobey a master. Wheeler, p. 2; 2 Black Com., 92, 93 ; 9 Ga. Rep., 579, 582, 583, 584.

*J. P. Sanderson* for the State.

1. The slave Luke cannot be excused or justified upon the grounds stated in the assignment of error, and the Court below did not err in refusing the instructions asked. In the absence of any decisions or rulings governing this

class of persons when acting under the direction or command of the master, we must turn to those *private relations* which approximate the nearest to that which exists between master and slave, and these are those of *husband* and *wife*, *parent* and *child*, *master* and *servant*.

The principal case where constraint of a superior is allowed as an excuse for criminal misconduct proceeds upon the matrimonial subjection of the wife to her husband, for neither a *child* nor a *servant* are excused the commission of any crime, whether capital or not capital, by the command or coercion of the parent or master. 1 Russel, [18,] 1 Hale P. C., 44–516; 1 Hawk. P. C., c. 1, § 14.

It is no excuse for an *infant* that he acted by the command of the father. Humphrey vs. Douglass, 10 Ves. R., 71; cited 5 Law Rep., 50.

This offence was committed when the master was absent and the slave was not acting under the control of the master. For in all cases when the wife offends *alone*, without the company of her husband, she is responsible for her offences as much as a *feme sole*. 1 Russ., 20; 1 Hawk. P. C., c. 1, § 12–13.

Nor is it any excuse for the wife, that she committed an offence by her husband's order and procurement, if she committed it in his absence. 1 Russ., 20; 1 Hawk. P. C., 44.

2. The principles of the common law are held to be applicable to the slave—not as a slave—but as a reasonable being; and having many of its safeguards thrown around his person, and protected by it, he must be held subject and amenable to its provisions. State vs. Rua, Wheeler on Slavery, 210; Fields vs. State of Tennessee, *ibid.*, 256.

The position that a slave is a person, and as such, recognized and protected by the laws, is evidenced by the various statutes of this State, as well as of others. Statutes

190      SUPREME COURT·

Luke, a Slave, vs. State of Florida.—Opinion of Court.

Thom. Dig., 499, § 2 ; 511, § 21, &c. ; 542, § 1 ; State vs. Hale, Wheeler, 239.

A general statute against unlawful shooting, stabbing, &c., by free persons, was held in N. C. to extend to the protection of slaves. Commonwealth vs. Corm, Wheeler, 254.

The general criminal statutes of this State are applicable to slaves in all cases, except those where special statutes have been enacted for them. Thom. Dig., 507, § 8.

This is a part of the general criminal code. Acts 1832, p. 71.

Previous to the Act of 1832, there was a law of force which would have excused Luke from the charge in the indictment, but which was properly repealed by the Act of 1832, sec. 9. Repealed Act, Revised Code, 1828, p. 50, § 8 ; Act, 1828, p. 75, § 105.

3. Humanity—self-preservation—public policy and necessity, enforce and demand that the ruling of the Court below be sustained.

THOMPSON, J. :

Two questions are presented by this record for the consideration of the Court. The appellant, Luke, was indicted under the Act of 1832, for malicious mischief, in killing sundry mules, the property of Joseph M. Hernandez.

The only evidence against the prisoner, as appears by the bill of exceptions, was his own admission, that he had killed the cattle by the direction and command of his master, because of their having trespassed upon the plantation of the latter. Upon this evidence, the counsel for the prisoner prayed the instruction of the Court below to the jury —that the prisoner had committed no act for which he could be criminally punished, for that the shooting of said mules as charged in the indictment, was not done maliciously.

nor could be so done by him, he, prisoner, being a slave, and acting under the control and by direction of his master. The refusal of the Court to give this instruction, forms the first error assigned here.

The 2d error is upon the judgment rendered in the Court below. The jury having found the prisoner guilty, assessed the punishment under the 59th section of the Act of February 10, 1832, (Thomp. Dig.,) at three months imprisonment, and the Court entered judgment upon the verdict that the prisoner be imprisoned in the common jail of St. John's County for the space of three calendar months, according to the verdict of the jury, and pay the costs of suit; and stand committed until the sentence be fully executed.

It is now alleged, that the prisoner could not be tried and punished under the Act of February 10, 1832, but only under the 61st section of the Act of November 21, 1828, Thomp. Dig., 541.

The first error assigned, presents one of the most interesting questions which can arise out of the institution of slavery as known to, and recognized by, our laws; but as the decision of the question so presented is not absolutely necessary to the disposition of the case, we pass it over without expressing or even intimating any opinion thereon, in the hope that if it is ever again presented for adjudication, we may be enabled to give to it that consideration and reflection which its interest and importance demand, and which the present limited term of this Court here, will not permit. It is urged by the counsel for appellant, upon the second error assigned, that the Legislature evidently intended to discriminate between white persons, and slaves and free persons of color, as well in the mode as in the degree of punishment, to be inflicted for the infraction of the penal laws. That in 1828, two Acts were passed, that of the 22d November, 1828, entitled An Act relating to crimes and

misdemeanors—and that of the 21st November, 1828, entitled An Act relating to crimes and misdemeanors committed by slaves, free negroes, and mulattoes; the first named designed to embrace the case of free white persons exclusively, and the latter to the class of persons named in the title alone. That the Act of 1832, which repealed the Act of November 22, 1828, is but a modification of the repealed Act, designed to supply its place alone, and not to disturb the previous distinction, established by the Legislature of 1828, in relation to the different classes of persons amenable to the criminal laws. And on the' other hand, it is contended, on behalf of the State, that the Act of 1832 embraces within its provisions in terms, all persons—which term, person, must be taken to include slaves and colored freemen, as well as white citizens; and that said Act being posterior in date, and imposing a milder punishment than that provided for by the Act of November 21, 1828, it operates a repeal of the latter Act, and therefore, the Act of 1832 is the only law of force, and the conviction and sentence was properly founded thereon.

A careful review of the legislation of the State must lead to the conclusion that it was intended to establish and preserve a distinction between the punishments to be inflicted on slaves and free persons of color, and those on white persons for the same violations of the criminal law. The two Acts passed in the year 1828, should be taken and construed together as one statute, and as creating the distinction alluded to. Thus the offences of assault, assault and battery, with or without the intent to kill or murder, were, by the Act of November 22, 1828, punished by a fine, at the discretion of the jury, the utmost extent or limit of the mulct being one thousand dollars; while the same offences committed by a slave or colored freeman upon a white person, are punished more severely by the Act of Nov.

21, 1828, a simple assault being punished by the infliction of 39 stripes, and the more aggravated offence of assault with intent to kill is punished by death. So, again, by the first named Act, robbery and burglary were punished by fine, pillory, or stripes, while by the latter Act, if committed by a slave, they are punished by death. And similar distinctions are to be found throughout the Act, those mentioned being sufficient for the purpose of illustration. Now these two Acts were not in conflict with each other; taking them as forming one whole, effect could be given to each and every part of both, because to interpret statutes properly, it is indispensably necessary to have regard to their provisions; to see of *what they treat;* the *quid* as well as the *quo modo.* Dwarris St. 757. Although in the absence of the Act of November 21, 1828, the punishment of that inferior caste of persons who are either slaves or free, might be inflicted under the general laws, yet as the Legislature has provided other and different modes and degrees of punishment for them, the latter must be observed. So careful was the Legislature to carry out this distinction, that by the 61st section of the Act of November 21, 1828, (Thomp. Dig.,) it was provided, that if any negro or mulatto, bond or free, shall commit any other crime or misdemeanor against the laws, it should be lawful for the jury convicting the offender to punish by any number of stripes they may award, not to exceed one hundred; and thus embracing within the generality of its provisions, the punishment for each and every and all offences, and excluding the idea, that in any case, they were to be liable to the penalties specified in and imposed by the Act of November 22, 1828.

This general Act, however, was repealed by the subsequent general statute, entitled An Act relating to crimes and misdemeanors, approved February 10, 1832; and it is

25

now to be seen whether this Act repealed the Act of Nov. 21, 1828, relating to crimes, &c., committed by slaves, free negroes and mulattoes. As a general rule, it is true, that every affirmative statute is a repeal by implication, of a precedent affirmative statute, so far as it is contrary thereto ; *leges posteriores priores contrarias abrogant*—but to apply this maxim of the law, it is necessary that the two Acts be in conflict with each other, which is not the case here. The last Act is general, and though it may inflict a milder punishment than the preceding statute for the same offence, yet the Act which is claimed to be repealed by this implication, is special and particular. The Act of November 22, 1828, which was repealed by the Act of 1832, was general in its terms, extending to all persons not excluded from its operation by the force and effect of its provisions ; and the Act of February 10, 1832, which repealed it, is equally extensive in its affirmative provisions ; but the Act of November 21, 1828, is special and particular, relating to the same crimes and offences committed by an inferior class of persons, slaves and colored freemen, and therefore, applying another rule in the interpretation or construction of statutes, the later general Act does not work any repeal of a former particular Act ; thus the stat. 5 Eliz., that no one shall use or trade without being apprenticed, did not take away the 4 and 5 Phil. and Ma., c. 5, that *no weaver* use, &c. Dwarris Stat., 673, citing 6 Co. Rep., 19, b. That the application of this rule of interpretation does no violence to the *intention* of the Legislature, is obvious from the particularity of the repealing clauses contained in the 79th and 80th sections of the Act of February 10, 1832. Section 79 simply repeals the Act of 22d November, 1828, and section 80 repeals an Act passed 17th November, 1829, which was in amendment thereto, and there is no sweeping clause of repeal as to all

Acts coming within the purview or conflicting with the provisions of the repealing statute. · From this, the inference is clearly deducible, that the Legislature, in 1832, did not intend to disturb the distinction established in 1828, between the two classes of persons subject to the laws, but to preserve it. We have nothing to do with the question of the policy of establishing and perpetuating such distinctions ; but if it were proper to express any opinion thereon, we should unhesitatingly express our approbation of the policy and propriety of such distinctions. The perpetuation of the institution, indeed the common safety of the citizens during its continuance, would seem to require that the superiority of the white or Caucassian race over the African negro, should be ever demonstrated and preserved so far as the dictates of humanity will allow—the degraded caste should be continually reminded of their inferior position, to keep them in a proper degree of subjection to the authority of the free white citizens. And thus there is an obvious propriety in visiting their offences with more degrading punishment than is inflicted on the white citizens, while the humanity of the law is demonstrated by securing to them the same forms of law in making defence—a trial by jury—compulsory process for their witnesses—the aid of counsel—and indeed, as full, fair, and impartial a trial, as can or may be claimed by a white person.

The Act of November 21, 1828, being unaffected by the subsequent Act of February 10, 1832, is in full force and vigor, and slaves, free negroes and mulattoes are to be tried and punished according to its provisions. They may be guilty of many of the infractions of the penal laws of the State, of which the white persons may be guilty ; and hence, if the general statute creates a new offence, before unknown to the common law, if it is one which a slave or

free colored person may commit, the latter may be indicted and punished for it. The indictment in such case would be under both statutes, that creating the offence, and also the Act of 21st November, 1828, because the one creates the offence and the other provides the penalty. If the offence is one known to the common law, the indictment must be under the Act of November 21, 1828, and the punishment must be assessed according to its provisions. In the case at bar, there being no punishment specially providing for malicious mischief when committed by a slave, resort should have been had to the 61st section of the Act of November 21, 1828, as the law governing the case, but this was not done; the punishment was assessed according to the provisions of the 59th section of the Act of February 10, 1832, and in this there was error, for which the judgment must be reversed.

And it is accordingly ordered, that the judgment of the Circuit Court be reversed, vacated and set aside.