246      SUPREME COURT.

Murray, a Slave, vs. The State.—Opinion of Court.

CLEM MURRAY, A SLAVE, PLAINTIFF IN ERROR, VS. THE STATE.

1. As a general rule, when an indictment is defective on demurrer, advantage may also be taken of the defect on motion in arrest of judgment.

2. The general system of legislation in this State has been to keep up a distinction between the *punishments* to be inflicted on white persons and slaves for the same violation of the criminal law, and also to keep up the distinction in statutory offences. White men and slaves will not be considered subjects of a common statute, unless clearly manifested.

3. If, from a view of the whole statute, together with the history of our legislation, the intention of the legislature to include slaves is manifest, they will be considered as included and held responsible in the word " person."

4. The Legislature of this State did not include *Slaves* in the first and second sections of the act of 27th February, 1839, making it a statutory offence for any *person* to keep a gaming table, and prohibiting betting and playing at such table.

This case was decided at Marianna.

Writ of error to Franklin Circuit Court.

The opinion of the Court contains a statement of the case, to which reference is made.

*Anderson & Milton* for plaintiff in error.

*W. D. Barnes*, for Attorney General, for the State.

FORWARD, J., delivered the opinion of the Court.

Clem Murray, a negro slave, was indicted in the Circuit Court, holden in and for the county of Franklin, under an act approved 27th February, 1839, and entitled " an act to amend an act entitled an act relating to crimes and misdemeanors," approved Feb. 10th, 1832, and under an amendment of the act of 1839 entitled " *an act to change and modify the penal statutes in reference to gaming*," passed 8th January, 1853, and under the 61st section of an act entitled " an act relating to crimes and misdemeanors committed by slaves, free negroes and mulattoes," passed Nov.

21, 1828. See Duval's Comp. page 228; Thomp. Digest, 541; Duval's Comp. 127; Thomp. Digest, 501, and Pamphlet Laws of 1853, page 117.

The *first* section of the act of 27th Feb., 1839, (see Thomp. Digest, page 501,) reads as follows, viz : "If any person, by himself or herself, servant or other agent, shall keep, have, exercise or maintain a gaming table or room or any house, booth, tent, shelter, or other place for the purpose of gaming, or in any place of which he or she may have the charge, control, or management, procure, suffer or permit any person or persons to play for money or other valuable thing, or things, or to bet or wager on such as may play for money or other valuable thing, or things, at any game, whatsoever, he, she or they so offending may be indicted, and on conviction, shall pay a fine not exceeding two thousand dollars nor less than two hundred dollars, and be imprisoned not more than six months, nor less than thirty days, at the discretion of the Court."

The second section is as follows, viz :

"If any person or persons shall play and bet at any gaming table, or in any gambling house, booth, tent or shelter, at any game of cards, dice, or checks, or with any other instruments, article or articles, thing or things whatsoever, for the purpose of winning or losing, he, she or they so offending, may be indicted, and on conviction, shall be fined in a sum not exceeding fifteen hundred dollars, and not less than ten dollars, and imprisoned for any time not exceeding six months, and not less than one month, at the discretion of the court."

The 61st section of the act of 1828 is in the following language, viz :

"If any negro or mulatto, bond or free, shall commit any other crimes or misdemeanors against the laws of this State, it shall be lawful for the jury convicting him of the

same, to punish him by such number of stripes as they may award, not exceeding one hundred."

There are two counts in the indictment; in the first it is alleged that the said slave did then and there play and bet at a gaming table, at a game of cards, to wit: at poker, with one Jim Dunham, and better known as Jim Deblois, for the purpose of winning, &c.

In the second count, he is charged, that he did then and there, in a place of which he then and there had the charge, to wit: in the house known as the said Clem's barber shop, pemit one Jim Dunham Deblois, a negro, then and there to play for money, a game, to wit: at a game at cards, &c. To this indictment he plead not guilty—was tried—found guilty, and the jury assessed his punishment at fifty lashes.

Afterwards a motion was made in arrest of judgment upon the following grounds, viz:

1. That the indictment does not set forth any offence punishing this class of persons.

2. That there is no statute of this State which punishes a negro bondman for playing and betting, or for keeping a gaming table, or makes it an indictable offence.

3. That the indictment does not set forth the offence or either of them with certainty and with particularity.

Which motion the Court overruled, and the defendant from said judgment sues out his writ of error to this Court.

The first question presented is, whether these objections could be raised on a motion in arrest of judgment. At common law an objection which would have been fatal on demurrer, was generally equally fatal in motions for arrest of judgment.

Had the indictment been demurred to before trial, its defectiveness would have been considered; therefore, as a general rule, advantage may be taken of the defect on motion for arrest.

The next and main question arises under the first and second errors, to wit : Whether the *offence* created in the above recited act, making the playing and betting at a gaming table, and permitting another to play for money in a place under his charge, is extended to slaves, and whether slaves are embraced in the act and punishable under the 61st section of the act of 1828.

It is contended by the counsel for the defendant, that as the offence is a statutory offence, not enumerated in the criminal code for slaves ; it cannot be extended to them unless specifically named, or it is the clear and manifest inference from the act, that the legislature intended to include them ; that the legislature could not have intended to include them, *first*, because it is not an offence committable by slaves ; *second*, because the offence is embraced in the general act relating to crimes and misdemeanors committed by white persons, passed in 1832, and amended in 1839, many years after the general act relating to slaves, and many years after the said 61st section of the act of 1828 was passed, and the punishment fixed by the act, creating the offence, clearly indicates that the legislature did not intend to bring slaves within its provisions.

On the part of the State it is contended, by the acting Attorney General, *first*, that playing and betting at cards and permitting such gaming, are offences which can be committed by a slave, and therefore brings them within the act ; *secondly*, that slaves may be guilty of many of the offences which may be committed by white persons ; *thirdly*, that the punishment for the white man and slave are different, although the offence is under the same act, (i. e.,) that the offence is created under the first and second sections of the act of 1839, but that the punishment for a slave is fixed by the 61st section of the act of 1828 ; *fourthly*, that

30

under the term "*person*," in the act, are included slaves as well as white persons.

In construing this statute and enquiring what was the intention of the legislature, we are to look to the history of the legislation of our State on this subject, and also to the rules of construction as laid down by authorities worthy to be adopted as precedents for us to follow.

The legislation of our State as to *punishment* of crimes committed by white persons and slaves, was fully reviewed in the case of Luke *vs.* the State, 5 Florida, 192; and the conclusion of this Court in that case, was, that it was intended to establish and preserve a distinction between the *punishments* to be inflicted on slaves and free persons of color, and those on white persons for the *same violations* of the criminal law. And it was held in that case, which was an indictment for *malicious mischief*, that the slave could be indicted under the statute creating the offence, and punished under the 61st section of the act of 1828, although a different punishment would have been inflicted upon a white man.

But it will be observed that in the case of Luke *vs.* the State, the Court held that malicious mischief was an offence that *could be committed* by a slave—malicious mischief being indictable at common law.

If we follow up the legislation of our State, in the same spirit that was done in the case of Luke *vs.* the State, as to punishment, we cannot fail to discover that our legislature, in establishing a general code for crimes, misdemeanors, and statutory offences committed by white persons, and another and separate code for slaves and free negroes, intended carrying out a *distinction*, and not make the white man and the slave subjects of a common system of laws, unless clearly manifested.

Having considered our legislaton, we are next to examine the general rules of construction of similar statutes. In

Smith's Commentaries on Statutes, &c., sec. 544, it is laid down, (says a note to Cobb on slavery, page 91,) that, "if, from a view of the whole statute, the intention of the legislature to include slaves is manifest, they will be considered as included in the word *person*." He cited also, State *vs.* Edmund, 4 Dev., 340. Again, says Nisbet, J. in Neal *vs.* Farmer, 9 Geo., 599: "Experience has proved what theory would have demonstrated, that masters and slaves cannot be governed by the same laws. So different in position, in rights, in duties, they cannot be the subjects of a common system of laws."

Says Mr. Cobb, in his valuable treatise on slavery, sec. 94: "Hence the conclusion, that statutory enactments never extend to or include the slave, neither to protect nor to *render him responsible, unless* specifically named or included by necessary implication."

Again, in section 302, he adds: "The result is, that the ordinary penal code of a slaveholding State does not cover offences committed by slaves, and the penalties thereby prescribed cannot be inflicted upon them." * * * * "Every slaveholding State has, hence, found it necessary to adopt a slave code, defining the offences of which a slave may be guilty, and affixing the appropriate penalties therefor."

With these general rules for a guide, let us turn to the act creating the offence upon which this indictment is founded, and see from a view of the whole statute whether there is a manifest intention of the legislature to include and make slaves responsible under it. If such had been their intention, it would have been easy to have made it manifest by a direct provision, instead of leaving it to a far-fetched inference. The legislature were creating a new offence against the morals of the community; if they had intended that slaves should be indicted under it, they certainly would have made the usual provisions in the punishment, to wit:

that if the offender is a slave, he shall be punished by corporeal punishment, but if a white man, then by fine and imprisonment.

Instead of this, they fix a punishment which to the slave is no punishment at all, because he has no means, nor can he have, of paying a fine, nor has he any liberty of which to be deprived. At the time of the passage of this act, the policy of the State legislation was clearly manifest and established, to-wit : in keeping up the distinction between free persons and slaves, in separate codes, and in providing different punishments.

The fact that there is no appearance of an intention to separate the punishments in this act is, in our opinion, an evidence the legislature did not intend to include and make slaves responsible.

We do not think the legislature intended including this class of persons, because as an additional reason, the offence is one a slave cannot in the nature of his situation commit. In the first place, he is not permitted by our laws or by our institutions to have the charge, control, or management of any house, booth, tent, shelter, or other place in which he could keep, have, exercise, or maintain a gaming table, or procure, suffer or permit any person to play for money or other valuable thing. He is under the control of his master ; he has no disposable will over any house, booth, tent, shelter, or other place. He is in such place by the will of his master, who is responsible if he, with the knowledge of his master, abuses and makes unlawful use of the place. In this case the Barber Shop was the shop of the master. If he permits his slave to act as a public barber, the slave is his agent. The slave has no control or management thereof, that is not under the master.

*Secondly.* The slave has not the right of private property; he is entirely deprived of it from the nature of the relation that exists between him and his master. His person and his *time*

being entirely the *property* of his master, whatever he may accumulate by his own labor, or is otherwise acquired by him, becomes immediately the property of his master.

In the case of Brandon et al. vs. Planter's and Merchant's Bank of Huntsville, 1 Stewart's Rep. 320, the Court per Saffold, Justice, say—"Our slaves can do nothing in their own right, can hold no property; can neither buy, sell, barter nor dispose of anything without express permission from the master or overseer; so that everything they can do or possess is, in legal contemplation, *on the authority of the master.*" Bynum vs. Boswick, 4 Dess. 266.

The legislative enactments of our State prohibit the slave from acquiring or holding property, and from being and living alone and without being under the charge of some white person. The same may be said of a slave playing and betting at any gaming table, or in any gambling house, &c. He cannot, he has nothing to bet with; the money is not his, and if he should lose, his master could claim it; if he won, his winnings belong to his master. Thus we think it is not in the nature of things that the slave could commit the offence laid in the indictment, unless the statute expressly enacts such acts of theirs shall be an offence against the law.

Where our legislation does not specify how far slaves and free persons of color are within its provisions, it is a difficult task to determine under statute offences against morals whether such persons can commit the offences or not.

The only rule to govern us is the peculiar relation they bear in society and towards their superiors.

Thus our general code provides and creates the offence of adultery and fornication, and like the act under consideration, does not discriminate between white persons and negroes. Yet no one would think of indicting a slave for such an offence, and why? because they are not supposed to be within the act creating the offence.

Nor would any one think of indicting a slave for passing counterfeit money, and why? because they cannot own any money, and if they passed it, the benefit derived belongs to the master.

From a view of the whole statute, the legislation of our State, and the circumstances not rendering the offence committable by a slave, we are of the opinion the legislature did not intend to include slaves within this provision of the act.

It is urged with some force and propriety that this conduct of slaves is a crying evil; if so, the remedy is with the legislature. It is much better for the master, the slave, and the community at large that provisions be made for the summary punishment of slaves for such offences before a Justice of the Peace, than that the slave be dignified and brought into court with the same importance with the white man, and the master in consequence thereof put to heavy expense in employing counsel and protecting his slave.

*Per curiam.* Let the judgment of the court below be arrested and the defendant discharged.